17 P.3d 889

Shubneesh BATRA, Plaintiff–Appellant–
Cross Respondent,

v.

Monica BATRA, Defendant–Respondent–
Cross Appellant.

No. 26026.

Court of Appeals of Idaho.

Jan. 16, 2001.

Cosho, Humphrey, Greener Welsh, Boise, for appellant. Stanley W. Welsh argued.

Bevis, Cameron Johnson, Boise, for respondent. James A. Bevis argued.

SCHWARTZMAN, Chief Judge.

Shubneesh Batra appeals from the order of the district court affirming the magistrate's decision with respect to division of property and child support in his divorce from Monica Batra. Shubneesh challenges: (1) the characterization of stock options received from his employer; (2) the tracing of assets used to purchase stock and exercise stock options; and (3) the findings support-

ing the trial court's order that Shubneesh reimburse Monica for her interest in a gold coin and for four sets of gold jewelry given to her by her parents at her wedding. Monica cross-appeals, challenging the method of valuing stock options. We affirm in part and vacate in part.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Prior to his marriage to Monica, Shubneesh, an engineer at Micron Technology, Inc. (Micron), began to receive the right to stock options beginning on September 27, 1993. The September 27 grant, as well as subsequent grants, stated that the options were to vest at a rate of 20 percent per year and expire on the anniversary date six years after the initial grant.[1] Shubneesh and Monica Batra entered into an arranged marriage on July 14, 1995, in New Delhi, India. During the course of the marriage Shubneesh received additional grants of stock options. On September 10, 1996, the Batras' only child, Millan, was born. Shortly thereafter the couple separated and Shubneesh filed for divorce.

A court trial was held, at which Shubneesh and Monica testified about their assets, liabilities, and ability to care for their infant son. Shubneesh presented evidence of Micron stocks and stock options granted prior to and during his marriage to Monica. Monica testified about four sets of gold jewelry, which she personally valued at $10,000, given to her as separate property gifts at her wedding and a gold coin she purchased during her marriage to Shubneesh. Thereafter, the magistrate entered findings of fact, conclusions of law and an order. A divorce decree was issued on November 20, 1997.

Shubneesh appealed to the district court, arguing that the magistrate had erred in dividing Micron stocks and stock options; in ruling that Shubneesh had failed to ade-

quately trace purchases of Micron stock to separate property sources; and in ordering Shubneesh to pay the value of or return to Monica the four sets of jewelry and $203, representing her share of the value of the gold coin. Monica filed a timely notice of cross-appeal. The magistrate stayed execution of the judgment. The district court affirmed the magistrate's decision in pertinent part and reversed and remanded the case for calculation of tax consequences. Shubneesh appeals and Monica cross-appeals.[2]

## II.

## STANDARD OF REVIEW

■ Our review of a magistrate's decision is made independently from, but with due regard for, the decision of a district court sitting in an appellate capacity. *Worzala v. Worzala,* 128 Idaho 408, 411, 913 P.2d 1178, 1181 (1996); *Smith v. Smith,* 124 Idaho 431, 436, 860 P.2d 634, 639 (1993); *McAffee v. McAffee,* 132 Idaho 281, 284, 971 P.2d 734, 737 (Ct.App.1999). The magistrate's findings of fact will be upheld if they are supported by substantial and competent evidence. *Worzala,* 128 Idaho at 411, 913 P.2d at 1181; *Smith,* 124 Idaho at 436, 860 P.2d at 639; *McAffee,* 132 Idaho at 284, 971 P.2d at 737.

■ The manner and method of acquisition of property, as well as the parties' treatment of that property, are questions of fact. We defer to the magistrate's findings on these issues when they are supported by substantial evidence. *Krebs v. Krebs,* 114 Idaho 571, 573–74, 759 P.2d 77, 79–80, (Ct. App.1988). However, characterization of an asset as separate or community, in light of the facts found, is a question of law over which we exercise free review. *Id.* With these principles in mind we now analyze, in turn, the character of the stock options, the assets used to exercise those stock options or to buy stock outright, and the resulting stock.

---

1. These separately vesting segments of options are commonly referred to as "flights."

2. Issues regarding the amount of child support and an asserted mathematical error in determin-

ing the community's interest in a particular flight of stock options vesting on October 18, 1998, have been withdrawn from this appeal subsequent to oral argument.

## III.

## CHOICE OF LAW APPLICABLE TO THE CHARACTERIZATION OF THE STOCK OPTIONS

### A. The Time–Rule Of *Hug* And *Short*

■ Each party argues for the application of a competing time-rule. Monica argues for application of the time-rule set forth in *Marriage of Hug*, 154 Cal.App.3d 780, 201 Cal. Rptr. 676 (Cal.App.1984), under which she would be entitled to a share of every flight of the options in the grant. Shubneesh argues for application of a time-rule similar to that applied in *Marriage of Short*, 125 Wash.2d 865, 890 P.2d 12 (1995), under which Monica would only be entitled to a share of those flights of options in which the year of vesting coincides with a period of the marriage. The question of which time-rule to apply is a matter of first impression for the Idaho appellate courts.

■ The parties have assumed that the choice of time-rule is a matter within the discretion of the magistrate. We reject that assumption for a number of reasons. Foremost among them is the *compelling need* for a rule that is both easy to apply and produces a fair and predictable result given the prominence of stock options as a method of attracting, compensating and providing incentives to key employees in today's highly competitive and technological economy. We recognize that stock options may be intended as a reward for past work or as an incentive for future service or any combination thereof. An award of yet to be vested stock options, such as those at issue here, which requires the employee spouse to continue as an employee throughout the vesting period, can as easily be characterized as incentive options. Thus, it makes little sense to invite the trial court to divine the intent behind the options. For these reasons, we adopt a single time-rule to be applied to the characterization of such stock options.

Under the *Hug* time-rule urged by Monica, the community's interest in the stock options is a fraction; the number of months on the job from start date to date of separation over the number of months on the job from start date to the date when the options could first be exercised, multiplied by the number of shares that could be purchased on the date of exercise. *Id.* at 783–4, 201 Cal.Rptr. at 678–79. In Idaho, the date of divorce would be substituted for the date of separation. *Desfosses v. Desfosses,* 120 Idaho 354, 360, 815 P.2d 1094, 1100 (Ct.App.1991) (citing *Suter v. Suter,* 97 Idaho 461, 546 P.2d 1169 (1976)). The *Hug* rule treats the options as continually maturing, or vesting, from the date of the grant, thus giving the community a fractional interest in every flight of the remaining unvested options. The community's full interest in the options might not vest for several years after the date of divorce. As such, the *Hug* approach may result in the parties' respective property interests being tied together for a potentially long period after divorce. In particularly acrimonious divorce cases, as the one at hand, this approach increases the opportunities for mischief, misunderstanding, and subsequent litigation. The *Hug* time-rule also runs counter to Idaho's policy of separating the parties' interests in the property as quickly as possible, giving each immediate control over their share of the community property as that interest vests, while avoiding the inequitable distribution of the assets. *See Balderson v. Balderson,* 127 Idaho 48, 53, 896 P.2d 956, 961 (1995). Thus, we are disinclined to accept *Hug's* rationale.

The magistrate here applied a modified *Short* time-rule adopted in prior cases by Ada County Magistrate Michael Dennard, a respected jurist in the area of family law. Under this modified *Short* time-rule, the community's interest is calculated on a per flight basis, typically a year-by-year basis. The community's interest is a fraction; the number of days of the marriage during the year of vesting of the flight of the stock option in question over the number of days in a year. The fraction is then converted into a percentage—the community's interest in the stock options in that particular flight. The modified *Short* time-rule is attractive, in part, because the denominator is always the same, providing ease of application.[3] This ap-

---

**3.** To illustrate the modified *Short* rule, assume that the employee spouse had worked for an

proach also has the added attraction of a bright-line rule. The community's interest in vesting flights of stock options is limited to those vesting in whole or in part during the years of the marriage, eliminating whole years of vesting outside of the marriage and thereby hastening separation of the parties' interests consistent with Idaho law.

■ Having considered the costs and benefits of these two approaches, which typify those applied across the country, we adopt the modified *Short* time-rule as the appropriate rule where unvested stock options are granted to the employee spouse and vesting occurs in whole or in part during marriage. Accordingly, we conclude that the magistrate applied the correct substantive law in characterizing and valuing the unvested stock options at issue in this case.

### B. Shubneesh's Challenges To The Magistrate's Application Of The Modified *Short* Time–Rule

■ In his first claim of error, Shubneesh argues that the magistrate erred in finding that yet-to-vest stock options were community property in proportion to the amount of the year during which the parties were married. Specifically, Shubneesh challenges the magistrate's characterization of flights of options with anniversary dates ending within 365 days after November 20, 1997, the date of divorce.[4] He argues that vesting of these options was contingent upon his continued employment beyond the date of divorce, and that had he chosen to quit working for Mi-

cron after November 20, 1997, all interest in these soon-to-vest options would be forfeited.

■ We reject Shubneesh's theory because it ignores a basic proposition of community property law—"income derived from a husband's or wife's 'efforts, labor and industry' during the marriage is community property." *Hiatt v. Hiatt,* 94 Idaho 367, 368, 487 P.2d 1121, 1122 (1971); *Wood v. Wood,* 124 Idaho 12, 15, 855 P.2d 473, 476 (Ct.App. 1993). Shubneesh's labor preceding the divorce contributed to the vesting of stock options in the months following the date of divorce. Accordingly, the magistrate's application of the time-rule correctly recognized that income—here in the form of stock options—was partially earned from Shubneesh's labor during marriage and, thus, that the community had a fractional interest in the stock options vesting in the months following the Batras' divorce.

■ Shubneesh also claims that the magistrate erred in characterizing 1,514 stock options granted on September 27, 1993, as community rather than separate property.[5] Shubneesh argues that proper application of the modified *Short* time-rule would have required a *pro rata* share of those options that vested during the first year of marriage to be characterized as separate property. We agree.

Stock options vesting prior to the date of the marriage are properly the separate property of Shubneesh. The community's interest in stock options vesting in the first year of marriage is proportionate to the number of days of the marriage during that year of

employer for 42 months, beginning on January 1, 1995, and had been granted 100 stock options on January 1, 1996, with the options vesting in flights at a rate of 20 percent per year on the option grant anniversary dates over the next five years, and that the couple had been married for 24 months, beginning on July 1, 1996 and ending in divorce on July 1, 1998. The community's interest in the stock options would be calculated as follows: For the first flight, those 20 options vesting on January 1, 1997, 183 days of marriage over 365 days in the year or $^{183}\!/_{365}$, equal to 50.1 percent of the 20 options that vested at the end of that year, or fractionally more than 10 stock options. For the second flight, the 20 options vesting on January 1, 1998, 365 days of marriage over 365 days in the year, $^{365}\!/_{365}$, equal to 100 percent of the 20 options that vested at the end of that year. For the third flight, 182 days of marriage over 365 days, equal to 49.9 percent of the

20 vested options, or fractionally less than 10 stock options. During the year of vesting of the fourth and fifth flights, the couple was not married and so the community has no interest in the options vesting at the conclusion of those years. The community would own 40 of the 100 stock options, exercisable on January 1, 1999, the date the third flight vests.

4. The character of those flights of options challenged by Shubneesh vested on the following anniversary dates: November 25, 1997; July 29, 1998; September 9, 1998; October 2, 1998; November 1, 1998.

5. These options vested at a rate of 20 percent per year on the anniversary date of the option grant—September 27.

vesting. From our review of the record, we conclude that the magistrate did not properly characterize the first two flights of these options from the 1993 grant. The first flight of 504 options vested on September 27, 1994, before the marriage, and was thus Shubneesh's separate property. Therefore, the magistrate erred in characterizing this flight as community property. The second flight of 504 options vested on September 17, 1995, a little over two months after Shubneesh and Monica married. Accordingly, the community share of the second flight is in proportion to the number of days of the marriage during the second year of vesting. Proper characterization of these two flights is essential to a correct determination of the character of 1,514 shares of stock acquired through exercise of these and other stock options during the course of the marriage. Accordingly, we vacate the magistrate's determination relative to these options and remand for a recalculation of the community interest therein.

**C. The Magistrate's Decision To Award Monica The Right To Exercise Her Options As They Become Vested Rather Than Ordering A Lump Sum Payment Based Upon The Stock Price At The Date Of Divorce**

▆▆▆▆ Shubneesh argues that the magistrate erred in awarding Monica the right to exercise her options as they become vested rather than allowing Shubneesh to pay her the value of the shares as of the date of divorce. A stock option is a form of discount coupon. An option allows the owner to buy a share of stock for a predetermined price. The higher the market price of the stock, the greater the discount between the option price and share price. Given the nature of stock options, a lump sum payment for yet to be vested stock options at the date of divorce would not reflect the value and risk inherent in stock options. *See Balderson,* 127 Idaho at 52–53, 896 P.2d at 960–61.

The magistrate properly considered that the options may only be exercised as they become vested and that the value of the options is, at least in part, the right to time one's purchase of stock through the exercise of the options, the value thereof varying in proportion to the discount between the option price and the underlying stock price. The magistrate divided the soon-to-vest stock options, ordering that Monica have the right to exercise her share of the community options by paying the exercise price after the vesting date. This method is consistent with I.C. § 32–712(1)(a) and furthers the policy of separating the parties' interests in the property, giving each immediate control over their interests in community property as that interest matures, while avoiding the inequitable distribution of the assets. *Balderson,* 127 Idaho at 53, 896 P.2d at 961. Shubneesh's claim of error is rejected.[6] This Court will not disturb the magistrate's method of distribution of Monica's share of the community's stock options after vesting. *Id.* at 53–54, 896 P.2d at 961–62. Accordingly, the magistrate's order granting Monica the right to exercise her options as they become vested is affirmed.

**D. Tax Consequences**

Shubneesh argues that Monica's exercise of vested stock options will have tax consequences for him. Implicitly, by requiring each party to bear the cost of exercise of their stock options, the court intended that each party bear the tax consequences of that exercise. *See Mulch v. Mulch,* 125 Idaho 93, 100, 867 P.2d 967, 974 (1994) (affirming an order of spousal maintenance based upon implicit findings by the trial court). Accordingly, we affirm this determination.[7]

## IV.

### CHARACTER AND TRACING OF FUNDS USED TO EXERCISE STOCK OPTIONS

▆▆▆ Idaho Code § 32–906 defines community property as "[a]ll other property ac-

---

**6.** To the extent that Shubneesh may be arguing that individual lots of stock options are not divisible, he failed to present evidence of such to the magistrate court. Accordingly, we do not address the possibility. Such a problem would only arise if Monica elected to exercise her portion of a vested block of options and Shubneesh declined to exercise the remaining portion of the vested block.

**7.** On remand, the magistrate may wish to expressly state that each party is to bear the tax consequences of exercise of their stock options.

quired after marriage by either husband or wife." *See Shill v. Shill*, 115 Idaho 115, 765 P.2d 140 (1988). Separate property is defined in I.C. §§ 32–903, 32–904 and 32–905. Commingling of separate and community property does not necessarily convert the separate property to community property. So long as the separate property of either spouse is identifiable through direct tracing or accounting, commingling of such separate property with community property does not convert the separate property into community property. *Barton v. Barton*, 132 Idaho 394, 396, 973 P.2d 746, 748 (1999); *Weilmunster v. Weilmunster*, 124 Idaho 227, 232, 858 P.2d 766, 771 (Ct.App.1993).

■■■ The doctrine of commingling is explained in *Josephson v. Josephson*, 115 Idaho 1142, 1145, 772 P.2d 1236, 1239 (Ct. App.1989) *overruled on other grounds, Bell v. Bell*, 122 Idaho 520, 835 P.2d 1331 (Ct.App. 1992):

> Where the parties have commingled their separate and community funds in a bank account, and treat them as one fund, it all becomes community property. *Gapsch v. Gapsch*, 76 Idaho 44, 277 P.2d 278 (1954). The commingling doctrine is a special application of the general presumption that all property acquired during the marriage is community property. *Houska v. Houska*, 95 Idaho 568, 512 P.2d 1317 (1973). The party who asserts that the property is separate has the burden of persuasion, and must prove the property is separate with reasonable certainty and particularity. *Id.* This may be accomplished through evidence of tracing or accounting. *See Evans v. Evans*, 92 Idaho 911, 453 P.2d 560 (1969).

As a general principle, property acquired takes on the same character as that of the funds or property used to acquire it. Thus, if an asset purchased during the marriage is purchased with separate property, that asset too becomes separate property. *Winn v. Winn*, 105 Idaho 811, 813, 673 P.2d 411, 413 (1983). However, "before the principle may be applied, the asset actually given in exchange for the property purchased must be identified." *Id.* at 814, 673 P.2d at 414.

In cases involving commingled property, the courts have recognized the use of an accounting method that treats expenditures for community purposes as having been made from community funds and expenditures for separate purposes as having been made from separate funds. *See Josephson*, 115 Idaho at 1145, 772 P.2d at 1239 (citing *Mix v. Mix*, 14 Cal.3d 604, 122 Cal.Rptr. 79, 536 P.2d 479 (1975) and *Barrington v. Barrington*, 290 S.W.2d 297 (Tex.Civ.App.1956) (both cases recognizing that if community expenditures during the marriage equal or exceed community income, any additional purchases or acquisitions necessarily are separate property)).

■■■ One question presented by this appeal is whether Shubneesh met his burden of presenting substantial and competent evidence proving to a reasonable certainty that the source of funds used to purchase stock through the exercise of stock options was Shubneesh's separate property. *Josephson*, 115 Idaho at 1145, 772 P.2d at 1239. The magistrate's factual findings and Shubneesh's bank statements establish that as of July 14, 1995, the date Shubneesh and Monica married, Shubneesh had $5,245.98 in separate funds in a bank account. Shunbeesh's first post-marriage stock purchase occurred on September 26, 1995, when he withdrew $8,629.25 to purchase 100 shares of Micron stock. Previously, on August 16, 1995, Shubneesh had deposited $11,360 in separate funds into the account. Between July 14 and September 26, $11,041.59 in community funds was also deposited into the account. The balance in the account on the day before Shubneesh purchased the 100 shares was $17,811.57. A second purchase, this time of 1,514 shares of Micron stock for $18,137.72, was made on March 12, 1997. Previously, on January 15, 1997, Shubneesh had deposited $20,405.55 in separate funds into the household account, which contained $8,676.35 in community funds. Between January 15 and March 12, $10,807.05 in community funds was deposited into the household account. The account may have contained as much as $19,483.40 in community funds on the date the 1,514 shares were purchased.

The magistrate's factual findings as to the separate character of the funds commingled are supported by substantial and competent evidence. Shubneesh testified that at the time of his marriage he had an account at First Security Bank containing $5,245.98 and another $18,155 dollars, 317,000 yen and 491 deutsche marks in a Citibank account. In a separate Citibank India account, Shubneesh had another $20,405.55. However, it is the tracing of these separate funds through the commingled accounts that is at issue here.

Noting that sufficient community assets were available to cover the purchases of stock, the magistrate concluded that Shubneesh had not successfully traced the stock purchases to separate property sources. Shubneesh argues that, through tracing evidence, he established that the funds used to exercise stock options were his separate property.[8]

 Bank statements, deposit slips, checks, tax returns, and the testimony and reports of accountants summarizing the parties' financial transactions during the marriage are appropriate sources of accounting evidence for tracing property acquired during marriage to community and/or separate sources. *Weilmunster,* 124 Idaho at 232–35, 858 P.2d at 771–74. *See also Wood,* 124 Idaho at 15, 855 P.2d at 476 (assets of a separate property business commingled during marriage were presumed community property wherein husband could not demonstrate through tracing how the business assets remaining at the time of divorce could be separate); *Bewley v. Bewley,* 116 Idaho 845, 847, 780 P.2d 596, 598 (Ct.App.1989) ($25,000 of a commingled separate property inheritance traced based upon used checks, bank records and witness testimony). When utilizing the accounting method, the court:

compares the aggregate community deposits and withdrawals for community expenditures. If the expenditures exceed the deposits, there is no community interest in the residual funds. If the deposits exceed the expenditures, the net amount reflects a community interest in any residual funds. In the event separate property is used for community expenditure, reimbursement may be sought from the community, unless a gift to the community was intended.

*Josephson,* 115 Idaho at 1145–46, 772 P.2d at 1239–40.

The evidence Shubneesh presented at trial consisted of bank statements showing that a total balance of funds equal to the separate property funds deposited were maintained until he withdrew funds to make the stock purchases. However, merely demonstrating that the commingled account retained a balance equal to the separate funds deposited is not enough to trace the stocks purchased to the separate property funds. Shubneesh made numerous cash and check withdrawals from the account between the date separate funds were deposited and the date funds were withdrawn to purchase stock. In order to meet his burden of establishing that separate funds were in fact used to purchase the stocks in question, Shubneesh first bore the burden of establishing the amount of separate funds remaining in the account on the date of stock purchase. One method of doing so would have been for Shubneesh to present evidence of the community or separate purpose of the numerous withdrawals from the account. He did not do so.[9] Thus, there is insufficient evidence establishing the amount of separate and community funds available on the days Shubneesh purchased the 100

---

**8.** Although the magistrate used the term "precise accounting" to describe Shubneesh's burden, from the full context of the magistrate's ruling, we conclude that the magistrate's use of that term refers only to Shubneesh's failure to show to what degree separate or community funds remained in the commingled account at the time stock was purchased. *See Weilmunster v. Weilmunster,* 124 Idaho 227, 238, 858 P.2d 766, 777 (Ct.App.1993) (quoting *Speer v. Quinlan,* 96 Idaho 119, 131, 525 P.2d 314, 326 (1973) (rejecting proof that community funds were exhausted be-

fore the date of purchase of each disputed asset.)).

**9.** Shubneesh provided payee information in the appendices of his Reply Brief, consisting of summaries of withdrawals identified in the bank statements. From our review of the record, this payee information was not included in the bank statements submitted as exhibits in this case before the magistrate. Thus, this evidence will not be considered by this court on appeal.

and the 1,514 shares of stock.[10] Accordingly, the magistrate's factual finding that "it cannot be ascertained what portion of the balance was separate and what portion community" at the time Shubneesh withdrew funds to purchase the 100 and 1,514 shares of Micron stock is supported by substantial and competent evidence in this case.

The purchase of another 260 shares of Micron stock must be viewed differently. The magistrate found that Shubneesh had deposited $3,036.86 in separate funds into a new account two months prior to making this stock purchase. At the time of the purchase, there were sufficient community funds in the account to purchase the stock without the use of the separate funds. The magistrate ruled that Shubneesh had not successfully traced the separate funds to any part of the stock purchase.

From our review of the record, no withdrawals were made from this account from its initial funding with separate funds until the stock purchase. The record also establishes that 260 shares were acquired through the exercise of stock options that vested solely during marriage and were thus community property. Additionally, a bank statement Shubneesh submitted in his effort to trace the separate funds to the purchase of the stock establishes that community funds in the amount of $5,454 were deposited only three days before Shubneesh withdrew $5,045 to purchase the 260 shares. *See Peterson v. Peterson,* 595 S.W.2d 889 (Tex.Civ. App.1980) (wherein funds for the purchase of property less than a month after marriage could only have come from the husband's recent inheritance—thus tracing a large deposit on one day to a dissimilar large withdrawal on another day). These community funds were available to exercise the community's options. Shubneesh presented no evidence to rebut the presumption that these community funds were used for an apparent community purpose—the exercise of the community's options.[11] Accordingly, the magistrate's conclusion is affirmed.

## V.

### CHARACTER OF THE ACQUIRED STOCK

The general rules governing this issue are well known. The character of the property vests at the time of its acquisition. *Winn v. Winn,* 105 Idaho 811, 673 P.2d 411 (1983). If proceeds from a sale of separate property are used to acquire other property, the acquired property also is separate in character. I.C. § 32–903; *Travelers Insurance Co. v. Johnson,* 97 Idaho 336, 544 P.2d 294 (1975). However, as noted in *Gapsch v. Gapsch,* 76 Idaho 44, 56, 277 P.2d 278, 285 (1954), "[w]here a business is begun with both community and separate funds it generally constitutes community and separate property in the proportion or ratio in which the contributions have been made by the two estates." *See also, Marriage of Thurmond,* 888 S.W.2d 269, 272–73 (Tex.App.1994) (wherein the husband and wife used $53,809 from wife's separate testamentary trust to pay part of the purchase price of a $198,809

---

10. Two methods that do not rely upon evidence of the purpose of withdrawals to rebut the community presumption attaching to commingled funds are inapplicable in this case. The "clearinghouse method" creates an inference that a withdrawal made at approximately the same time as a deposit takes on the character of that deposit. *See Estate of Hanau v. Hanau,* 730 S.W.2d 663 (Tex.1987). However, Shubneesh's separate property deposits and the withdrawals to purchase stock did not occur at approximately the same time. The purchase of the 100 shares occurred two months after the separate funds deposit. The purchase of the 1,514 shares occurred one month after the separate funds deposit.

The "identical sum inference" applies where separate funds are deposited and an identical sum is shortly thereafter withdrawn. *See McKin-*

*ley v. McKinley,* 496 S.W.2d 540 (Tex.1973). The separate funds Shubneesh deposited and later withdrew to purchase stock were not identical. Shubneesh had deposited $11,360 and later withdrew $8,629.25 to purchase the 100 shares. Shubneesh had deposited $20,405.55 and later withdrew $18,676.35 to purchase the 1,514 shares. The several thousand dollar difference in these sums renders the "identical sum inference" inapplicable here.

11. To allow otherwise might be to invite the spouse with financial control to appropriate a community opportunity—exercise of the stock options—thereby gaining a separate interest in what would otherwise have been a wholly community asset.

home, giving the wife a 27.07 percent interest in the value of the home as her separate property upon divorce). If vested prior to marriage, the option is separate property. Exercise of a separate property option during marriage does not convert it into community property. However, if exercised with commingled or otherwise community assets, the community acquires an interest in the stock acquired through that exercise. This is not, however, a case in which the separate property of one spouse has been enhanced by community property, labor or improvement. *See, e.g., Pringle v. Pringle,* 109 Idaho 1026, 1027–28, 712 P.2d 727, 728–29 (Ct.App.1985). Rather, an entirely new form of property— stock—was acquired during marriage through the use of community and separate property stock options and money. Thus, the trial court must recognize *both* the separate and community interests in the resulting stock.

■■■■ The determination of the character of the resulting stock must proceed as set forth above: (1) the character of the options; (2) the character of the funds used to exercise the options; and (3) the character of the resulting stock. For example, regarding the exercise of stock options to purchase 1,514 shares, a portion of the options belong to the community, no matter if the shares were purchased with separate funds. The community's interest in the options must be taken into consideration in calculating the community's interest in the stock acquired through exercise of those options.[12] *Tilton v. Tilton,* 85 Idaho 245, 247, 378 P.2d 191, 193 (1963); *Gapsch,* 76 Idaho at 56, 277 P.2d at 285. On remand, the magistrate must determine the character of the 1,514 shares of stock Shubneesh purchased with community funds

through the exercise of stock options owned in part by the community. *See* Section III B., *supra.*

## VI.

## THE DISTRICT COURT DID NOT ERR IN ORDERING SHUBNEESH TO RETURN TO MONICA FOUR SETS OF GOLD JEWELRY OR PAY HER THE SUM OF $10,000

### A. Standard Of Review

■■■■ As explained in *Huerta v. Huerta,* 127 Idaho 77, 79, 896 P.2d 985, 987 (Ct. App.1995):

Where a magistrate has set out to achieve equality in a division of property, the division and divorce decree will not be disturbed on appeal if it appears through substantial, albeit conflicting, evidence that the parties have received substantially equal shares. I.C. § 32–712. *Liebelt v. Liebelt,* 125 Idaho 302, 870 P.2d 9 (Ct.App. 1994); *Wood v. Wood,* 124 Idaho 12, 855 P.2d 473 (Ct.App.1993). When there is conflicting evidence regarding property division, it is the magistrate's task to evaluate the credibility of the witnesses and to weigh the evidence presented. *Desfosses v. Desfosses,* 120 Idaho 354, 815 P.2d 1094 (Ct.App.1991).

### B. Discussion

Monica testified that at the wedding her parents gave her four sets of jewelry that she brought with her to the United States. Monica testified that after she returned from the hospital from giving birth to Millan, she was unable to find her passport, college de-

---

**12.** To illustrate the proper character determination of stock purchased with both community and separate property options and community and separate funds, assume that of 100 options for the purchase of ABC stock worth $30 a share at an exercise price of $10 a share, of which 40 percent belong to the community and 60 percent are separate property. Assume that $1,000, of which $500 belonged to the community and $500 was separate property, is used to exercise the options ($10 exercise price times 100 options). On these facts, the option value constitutes two thirds of stock price ($20 per share times 100 or $2000). Divided in proportion to the interest each estate holds in the option (40 percent to the

community and 60 percent separate) the community owns $800 and the remaining $1200 is separate. To this, the community and separate property funds are added, bringing the community's interest in the stock to $1,300 of the $3,000 value of the stock as of the date of purchase. Thus, the community's interest in the stock is fixed as of the date of purchase in proportion to its contribution, 13/30ths of the purchase price or 43.333 percent. Likewise with the separate property interest, 17/30ths or 56.666 percent. These percentages express the community and separate property interest in the stock whether it increases or decreases in value.

grees and the jewelry given to her by her parents. Monica claimed that Shubneesh had possession of her jewelry and a gold coin purchased during the marriage for $406 (presumptively community property of which her share would be $203). Monica identified the jewelry given to her by her parents in wedding photographs.

On cross-examination, Monica indicated that the value of the four sets of jewelry given to her by her own family was $10,000; that she brought the four sets with her to the United States; and that she kept the jewelry at home in Boise. She also stated that the jewelry was not insured or declared through the United States Customs Service upon entering the United States because Shubneesh was concerned about taxes. Monica said that she last saw the jewelry just before Millan was born. After she returned from the hospital, she asked Shubneesh if he put it in a safety deposit box, but Shubneesh never answered her question.

On appeal, Shubneesh objects to the magistrate's rulings as to the value and possession of Monica's jewelry and the gold coin. Regarding Monica's testimony about the value of her jewelry, in *Pocatello Auto Color, Inc. v. Akzo Coatings, Inc.*, 127 Idaho 41, 43–44, 896 P.2d 949, 951–52 (1995) (quoting *Rankin v. Caldwell*, 15 Idaho 625, 632, 99 P. 108, 110 (1908)), the Idaho Supreme Court reiterated:

> "The general rule, that to qualify a witness to testify as to market value, a proper foundation must be laid showing the witness to have knowledge upon the subject, does not apply to a party who is testifying to the value of property which he owns. The owner of property is presumed ... to be familiar with its value, by reason of inquiries, comparisons, purchases and sales. The weight of such testimony is another question, and may be affected by disclosures made upon cross-examination as to the basis for such knowledge, but this will not disqualify the owner as a witness."

We note that Shubneesh's counsel did not cross-examine Monica about how she came to value the four sets of gold jewelry, opting instead to challenge the existence of the jewelry itself.

Monica's testimony about the gift of four sets of gold jewelry from her parents was found to be credible and supported by the evidence—photographs of gold jewelry on her person taken after rented jewelry had been returned. The magistrate likewise found her testimony about the gold coin to be credible and supported by the evidence—a checkbook entry by Shubneesh for the amount of the gold coin.

We conclude that Monica's testimony as to the jewelry she received, the purchase of the gold coin, and where she last saw them—in the home she and Shubneesh shared—is substantial and competent evidence that the jewelry and coin existed. Further, her testimony about Shubneesh's conduct during their marriage and separation is substantial and competent, albeit circumstantial, evidence that supports the trial court's finding that Shubneesh retained or gave the jewelry to others while in his control. The trial court did not abuse its discretion in crediting Monica's testimony concerning the value of the gold coin purchased during marriage or the jewelry given to her by her parents. *Pocatello Auto Color, Inc.*, 127 Idaho at 43–44, 896 P.2d at 951–52. The magistrate, in the role of fact finder, properly evaluated the weight of Monica's testimony. Thus, the trial court's order that Shubneesh return the jewelry or be subject to a judgment in Monica's favor in the amount of $10,000, plus her share of the value of the gold coin, is affirmed.

## VII.

## CONCLUSION

The magistrate's findings of fact, conclusions of law and order is vacated in part, affirmed in part, and remanded for more particularized findings as to (1) the character of the 1,514 stock options and (2) the character of the stock acquired through exercise of those options. Each party is to bear his/her own costs and attorney fees on appeal.

Judge PERRY and Judge Pro Tem GUTIERREZ concur.